JOHN RESETAR, JR. *v.* STATE BOARD OF
EDUCATION OF MARYLAND ET AL.

[No. 62, September Term, 1978.]

*Decided March 8, 1979.*

538

*Josiah Lyman,* with whom were *Simon Tucker* and *Earl H. Davis* on the brief, for appellant.

*Robert S. Bourbon* for Board of Education of Montgomery County. No brief filed on behalf of other appellee.

SMITH, J., delivered the opinion of the Court. ORTH J., filed an opinion concurring in part and dissenting in part in which MURPHY, C. J., joins at page 563 *infra.*

We are here concerned with whether use of the racially derogatory term "jungle bunnies" by a teacher in referring to certain junior high school pupils amounts to misconduct in office within the meaning of then Maryland Code (1957, 1969 Repl. Vol.) Art. 77, § 114.[1] We shall here hold that there was sufficient evidence to warrant the conclusions drawn by the administrative agency, that the agency made no error of law in determining that the statements made constituted misconduct in office, and that under the facts and circumstances of this case appellant, John Resetar, Jr. (Resetar), was properly discharged as a teacher by the Board of Education of Montgomery County (the County Board).

Resetar was advised by the Superintendent of Schools of Montgomery County (the County Superintendent) that a remark made by him to a group of junior high school students "might be interpreted as being intemperate under the circumstances and might be interpreted as having a racial connotation." The County Superintendent said he considered Resetar's conduct to be contrary to the County Board's "Policy Statement on Human Relations," as "educationally unsound and unprofessional, and [as such could] not be accepted by [the Montgomery County] school system as proper behavior by an employee." He told Resetar that, since he regarded the conduct in question to be contrary to Art. 77, § 114, he would recommend to the County Board that Resetar be dismissed. In his letter to Resetar the County Superintendent referred to the fact that Resetar had "been

---

1. Now found without relevant change in Code (1978) § 6-202, Education Article.

warned both formally and informally, while a staff member at [three different junior high schools] about making remarks to students and/or fellow staff members which were not only intemperate and overreactive, but which also, in some instances, had derogatory, racial, or ethnic connotations." The County Superintendent said that in making his recommendation for dismissal he took into consideration "the cumulative effect of [Resetar's] behavior in [his] previous assignments despite earlier warnings that this type language and behavior was inappropriate and could not be condoned . . . ." He told Resetar of his right to request a hearing before the County Board, which hearing was requested.

Art. 77, § 114 then provided for suspension or dismissal of a teacher by a county board on the recommendation of its county superintendent of schools on the grounds of "immorality, misconduct in office, insubordination, incompetency, or wilful neglect of duty . . . ." Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) Art. 77, § 114A, as then in effect, authorized the County Board to have a hearing examiner for the taking of testimony under § 114. A hearing was duly held. The hearing examiner said in pertinent part in his findings of fact:

> The event giving rise to the charges occurred on June 18, 1974. During the school year 1973-1974 Mr. Resetar was a seventh grade science teacher . . . . June 18th was the last day of school. Mr. Resetar closed the windows in the classroom to which he was assigned to make the room secure for the summer, after all the students were out of the building. Another teacher . . . used the same classroom and was present in it at the time. Also present was . . . [the] secretary to the principal. A group of perhaps 15 to 25 students was standing on the school grounds outside. While some of the students were directing insulting and obscene remarks to Mr. Resetar, Randolph Tootle, an assistant principal of the school, came along. The testimony of Mr. Resetar, [the other teacher], [the secretary], and Mr. Tootle is essentially the same, except for the opened or closed

state of the windows and the audibility of what Mr. Resetar said.

Mr. Resetar testified that he opened a window as Mr. Tootle came along and said, as closely as he can remember it:

"Mr. Tootle this is what I have reference to. This is what I mean when I have been coming to you for some aid for both the students and myself."

This remark relates back to the fact that Mr. Resetar on a number of occasions during the year had referred disciplinary problems involving some of the same students to Mr. Tootle. Mr. Resetar then said to himself, as closely as he can remember it:

"Look at those jungle bunnies. Somebody ought to feed them bananas."

Mr. Resetar testified that he closed the window immediately after speaking to Mr. Tootle, so that all the windows were closed before he made the jungle bunny remark. He believed that it was "humanly impossible" for anyone outside the window to hear him. He was speaking only to himself, and did not intend for [the other teacher] and [the secretary] to hear him either. He characterized his remark as a "mumble," reflecting his disgust and frustration with the attitude of these students throughout the year.

As it turned out, however, Mr. Tootle and some of the students did hear the jungle bunny remark. Mr. Tootle testified that he heard it, and that several girls asked him if he was going to do anything about it. Further, one of the students called back to Mr. Resetar something to the effect of, "Go ahead on big head." It was also Mr. Tootle's recollection that two of the classroom windows were opened, while others were closed. With respect to Mr. Resetar's tone of voice, Mr. Tootle's recollection was:

"A little louder than a conversational tone because he had to get my attention from where I was over

some of the noise that was being made by the students out there."

He was not shouting, and his tone of voice did not indicate that he was particularly angry or upset. On cross-examination, Mr. Tootle agreed that Mr. Resetar's tone of voice could be characterized as "bantering."

[The other teacher] testified that there were students in the hallways as well as outdoors, fairly noisy as they called their good-byes. She thought all of the windows were opened. She was unable to characterize Mr. Resetar's tone of voice as conversational or louder, because "Mr. Resetar speaks louder than most of us and it would be difficult to say." She did not know whether anybody heard the jungle bunny comment or not, but thought that there were students who could have heard it if they were paying attention.

[The secretary] testified that at least one window in the room was opened, and that Mr. Resetar was leaning toward it and speaking through the opened window. Following the jungle bunny remark, she testified that Mr. Tootle looked up and that at least two of the students called back some retaliatory remarks.

The evidence adduced before the County Board's examiner included the bases for the earlier warnings to Resetar. This hearing examiner discussed those situations in his conclusions:

I conclude that the other episodes that are the subject of the charges also reflect varying degrees of intemperate conduct. I consider the lunchroom conversation to be on the trivial side. Of course, casting aspersions on school staff members is not to be encouraged; but then, supposedly private lunch table conversation among men should not be too closely scrutinized. Mr. Resetar appears to have been careless on this occasion, and probably

habitually so, as to who might be listening to his disparaging comments. But the incident, standing by itself, would not, in my opinion, constitute misconduct. Calling the guidance counselor a "God damned liar" must be classified as intemperate and over-reactive to the counselor's sarcastic remark. This unfortunately turned a minor annoyance into a serious conflict. But the fault was not entirely Mr. Resetar's. The superintendent determined that one or both of these incidents constituted misconduct, and issued a letter of reprimand in 1972. I conclude the lunchroom comments should not be classed as misconduct, but I am inclined to agree with the superintendent to the extent that the liar accusation barely goes across the misconduct threshold.

In telling the student she was dirty, or words to that effect, Mr. Resetar was intemperate. There may be occasions when a teacher would consider it to be beneficial to suggest to a child improved habits of personal care, but this does not appear to have been such a case. Mr. Resetar initially spoke sarcastically to a noisy student, and then responded to the impertinence of the accompanying student with a personal affront. I conclude that this was misconduct, but not aggravated. Mr. Resetar's tirade against the disruptive boys in the presence of the office staff and the school visitor was intemperate, but, in my opinion, would not by itself amount to misconduct.

The hearing examiner discussed the "jungle bunny" incident in his conclusions, saying, "[T]here was misbehavior on the part of a group of students, directed toward Mr. Resetar. However, I conclude it was intemperance, rising to the level of misconduct, for Mr. Resetar to respond with a racial epithet." In his recommendation the examiner pointed to his conclusion "that three instances of intemperate conduct amounting to misconduct ha[d] been shown," said that one

of the incidents also "constitute[d] misconduct in violation of the Human Relations Policy," and then said:

> I believe that no one of these cases, standing by itself, is sufficiently extreme to warrant dismissal of the teacher. It is necessary, therefore, to consider whether such a pattern of inappropriate behavior exists as to aggravate the particular offenses to the point where the sanction of dismissal is warranted. From the standpoint of racial bias, I have concluded that no such pattern has been shown. With respect to intemperate outbursts, however, such a pattern has been shown.
>
> The case is a close one, since only the jungle bunny episode is particularly serious. Yet the pattern of intemperate conduct has been persistent. There have been official warnings to this effect and a more gentle suggestion that "he maintain his professional composure." But the pattern has persisted during the 1973-1974 school year . . ., culminating in the jungle bunny case. For this reason, I recommend that the superintendent's recommendation be adopted and that Mr. Resetar be dismissed for misconduct in office.

The County Board held a hearing at which Resetar and his counsel were present. It ordered Resetar's dismissal for misconduct in office. The County Board noted, however, that its "schedule did not permit it to hear . . . argument [in the case] within 30 days as set forth in its rules." Therefore, it directed Resetar's reinstatement "to pay for the period of March 27 to April 10, 1975," the date of its hearing.

As was his right under § 114, Resetar appealed to the State Board of Education (the State Board). At the time here relevant its powers were set forth in Code (1957, 1975 Repl. Vol.) Art. 77, § 6.[2] They include "explain[ing] the true intent and meaning of the law, and . . . decid[ing] all controversies

---

2. Now found without significant change in Code (1978) § 2-205 (b)-(f), Education Article.

and disputes that arise under it . . . ." The matter came on for hearing before the State Board's hearing examiner. The parties agreed that the transcript of testimony before the County Board's examiner should be introduced into evidence and considered by the State Board's examiner in addition to the testimony of the live witnesses. A number of persons testified, all of whom had testified below. The State Board's examiner said:

> After having carefully considered all of the evidence at the hearing *de novo,* including the transcript of the hearing below, I have reached the same findings, conclusions and recommendations as did [the County Board's] Hearing Examiner . . . . Accordingly, I adopt them as my own and incorporate his entire report herein by reference.

He considered Resetar's contention that the failure of the County Board to issue an opinion within 30 days of the receipt of its hearing examiner's memorandum and opinion as provided by its own rules vitiated its order. He said that "there was no showing that the [County] Board had purposely delayed its decision in order to injure [Resetar]," and there was no "showing that [Resetar] had been materially disadvantaged in seeking employment in the teaching field or otherwise." He concluded on that issue, "[I]f there was procedural error, it was not prejudicial . . . ." He said he gave careful consideration "whether to recommend suspension of Mr. Resetar, rather than the more drastic step of dismissal." The examiner then said:

> I would have been inclined to make such a recommendation had I been able to find, either (1) that Mr. Resetar had not previously been put on notice that his pattern of conduct was intemperate, or (2) that there was a reasonably good chance that, chastened by the experience of this case, he would control his intemperateness in the future. Unfortunately, neither finding was possible.
>
> As to (1), Mr. Resetar had received an official

reprimand in a letter dated December 8, 1972 from [the County Superintendent] after he had been placed on leave with salary during investigation of allegations of inappropriate personal conduct at [another] [s]chool. ("Your language use was inappropriate and cannot be condoned. Any future behavior on your part along these lines will not be tolerated.") Mr. Resetar had also been cautioned in writing on March 7, 1973, and on May 17, 1973, by the Assistant Principal of [a third] [s]chool about his unprofessional manner of disciplining school children.

As to (2), the entire record leaves an unmistakable impression that respondent simply does not have the temperament to cope with present-day conditions in the Montgomery County School system. In view of the likelihood of a recurrence of his intemperate conduct, any attempt to reinject him into that system would not be fair to the students, teachers and administrators, or even to himself.

The State Board adopted the findings, conclusions and recommendations of its hearing examiner.

An appeal to the Circuit Court for Montgomery County followed. That court affirmed. Resetar then appealed to the Court of Special Appeals. We granted the writ of certiorari prior to consideration of the case by that court.

In this Court Resetar contends: (1) the circuit court erred in refusing to permit him to present additional evidence; (2) it likewise erred in "finding and determining that there was sufficient evidence to warrant [his] dismissal . . . as a tenured teacher in the Montgomery County school system"; (3) "[t]he alleged statement attributed to [Resetar] involving a statement of racial connotation did not constitute an act of misconduct" warranting his dismissal; and (4) the County Board "was precluded from dismissing [him] for misconduct in office after reinstating him as a tenured teacher in the school system for the period of March 27 to April 10, 1975."

## I

We first address the issue of whether the apparent violation by the County Board of its own rule has the effect of rendering void its action of dismissal.

The County Board's rule relative to hearings before an examiner states in relevant part:

> The findings, conclusions, and recommendations of the Hearing Examiner shall be distributed to or mailed to the parties and the Board of Education not more than fifteen (15) days after the completion of the hearing and receipt of the transcript or the filing of briefs if required or authorized. The Board shall review this material and render a decision in each case within thirty (30) days of the receipt of the Hearing Examiner's findings.

The question of whether a statutory provision using the word "shall" is mandatory or directory "turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished." *Hitchins v. City of Cumberland,* 215 Md. 315, 323, 138 A. 2d 359 (1958). As was said in *Blumenthal v. Clerk of Cir. Ct.,* 278 Md. 398, 408, 365 A. 2d 279 (1976), "the word 'shall' is not treated as signifying a mandatory intent if the context in which it is used indicates otherwise [citing cases]." Chief Judge McSherry observed for our predecessors in *Upshur v. Baltimore City,* 94 Md. 743, 51 A. 953 (1902):

> The last sentence of *sec. 29, Art. 3* of the Constitution, provides: "And whenever the General Assembly shall enact any Public General Law, not amendatory of any section, or article of the said Code, *it shall be the duty* of the General Assembly to enact the same, in articles and sections, in the same manner, as the Code is arranged." This provision though containing the imperative word *shall* and though imposing an explicit *duty,* was held by this Court to be *directory,* and a law passed without the observance of that requirement was

upheld. *Co. Coms. v. Meekins,* 50 Md. [28,] 45 [(1878)]. It is not disputed that cases may be found where, owing to peculiar conditions, the word "direct" has been held to impose a mandatory duty. Such, for instance, is the case *Mayor, &c., v. Reitz,* 50 Md. 574 [(1879)]. But mere words do not control. The whole surroundings, the purposes of the enactment, the ends to be accomplished, the consequences that may result from one meaning rather than from another, and the cardinal rule that seemingly incongruous provisions shall be made to harmonize rather than conflict, *(New Lamp Ch. Co. v. Ansonia Co.,* 91 U.S. 656, [23 L. Ed. 336 (1876),]) must all be considered in determining whether particular words shall have a mandatory or a directory effect ascribed to them. [*Id.* at 757 (emphasis in original).]

More recently in *Director v. Cash,* 269 Md. 331, 345, 305 A. 2d 833 (1973), *cert. denied sub. nom. Vucci v. Boslow,* 414 U. S. 1136 (1974), and in *Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 533, 325 A. 2d 718 (1974), we have regarded as significant the fact that the language of the statute under consideration provided no penalty for failure to act within the time prescribed, although we observed in the latter instance that this was not controlling.

Maryland Constitution Art. IV, § 15 provides that opinions of this Court "shall be filed within three months after the argument, or submission of the cause . . . ." Art. IV, § 23 specifies that judges of the circuit courts "shall render their decisions . . . within two months" after cases have been argued or submitted to them. In *McCall's Ferry Co. v. Price,* 108 Md. 96, 69 A. 832 (1908), our predecessors were faced with a motion for reargument on the ground that the Court's opinion was not filed within three months. The Court said it "hestitate[d] to refer to the reasons for not filing [its] opinion sooner, and suppose[d] they were understood, but deem[ed] it proper in view of [the motion] to briefly state them." It observed that the judge to whom the case had been assigned

had "prepared the opinion as promptly as the character of the case permitted . . . but before it was adopted by the Court, he was overtaken by a serious illness . . . ." The opinion which he had prepared was circulated among the judges of the Court while he was still in the hospital. Some members of the Court, although concurring in the law as announced in the opinion, had "some questions of fact which required further communication with him before filing the opinion, as written, or making any alterations in it, as courtesy and practice of this Court demanded." Therefore, a per curiam order was filed affirming the judgment but stating that the Court's opinion would be filed later "as has been the practice of this Court, when the circumstances justified and required that course." In overruling the motion for reargument the observation was made:

> So far as we are aware, it has always been the opinion of the members of this Court that the clause is merely directory, and not mandatory, and hence the Court has not hesitated when circumstances required it to file opinions after the three months. It has for example sometimes at its final sittings at the April Term (usually in June) when for some satisfactory reason no opinion had been adopted, affirmed cases by *per curiam* orders, and filed opinions at the following October Term. The object of the constitutional provision is to have prompt decisions of causes, and no one can justly complain of unnecessary delay by this Court in filing opinions and deciding cases before it. It certainly would not be within either the letter or the spirit of this provision to grant a reargument, because an opinion had not been filed within three months—thereby causing further delay. [*Id.* at 113.]

Judge Singley said for the Court in *Maryland St. Bar Ass'n v. Hirsch,* 274 Md. 368, 374, 335 A. 2d 108, *cert. denied,* 422 U. S. 1012 (1975), concerning the constitutional requirement pertaining to circuit courts and their opinions, "We have long

held these provisions to be directory and not mandatory," citing *Davidson v. Katz,* 254 Md. 69, 78-79, 255 A. 2d 49 (1969), and *Pressley v. Warden,* 242 Md. 405, 406-07, 219 A. 2d 25 (1966). To this list could be added *Myers v. State,* 218 Md. 49, 51, 145 A. 2d 228 (1958); *Suttleman v. Bd. of Liq. Lic. Com'rs.,* 209 Md. 134, 140, 120 A. 2d 388 (1956); and *Snyder v. Cearfoss,* 186 Md. 360, 370, 46 A. 2d 607 (1946). Judge Henderson observed for the Court in *Snyder* that the constitutional provision "provides no penalty for failure to act within the time prescribed."

The County Board's regulation provides no penalty and makes no provision in the event of a violation of the limit imposed. Resetar has suffered no prejudice. He received pay which he might not otherwise have received. The delay was brief. We are of the view that neither the delay nor the temporary reinstatement had the effect of stripping the County Board of authority to dismiss Resetar. The purpose of the provision no doubt was, as said by the Court in *McCall's Ferry,* "to have prompt decisions of causes."

## II

At the time applicable to this proceeding authority for the presentation of additional evidence at a hearing of an administrative appeal was found in Code (1957, 1971 Repl. Vol.) Art. 41, § 255 (e) and Maryland Rule B10. The latter provides merely that additional evidence may be allowed when permitted by law. The code provision permits the presentation of such evidence upon application to the court "before the date set for hearing" and a showing "to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency . . . ."

The trial judge made repeated attempts to ascertain precisely what Resetar expected to prove by the additional testimony. Resetar's counsel appeared to indicate that through certain witnesses, many of whom testified at the County Board and State Board hearings, he would prove a conspiracy against Resetar and that school officials in other

counties had been given unfavorable comments relative to Resetar. It was pointed out by the County Board that different counsel for Resetar at the State Board hearing had raised the conspiracy issue.

The matter was taken under advisement by the trial judge. In ultimately ruling on the motion he indicated he had examined the entire transcript from the two hearings and read all of the exhibits. He pointed out that of the witnesses Resetar desired to call "twelve ... testified in the County proceeding and eleven of the same twelve testified in the State proceeding. There was ample opportunity afforded [Resetar] in both of those hearings to present testimony; in one of them he did and the other he didn't." The court observed that Resetar had since changed lawyers but "that this mere fact that he has changed lawyers, and the new lawyer now sees some holes in the case presented by the first lawyer, doesn't support a motion for new evidence ...." Accordingly, he ruled:

> There is no new evidence proffered which would relate to the jurisdiction or integrity of the proceedings below. The complaints that are made in these regards are based on matters that are already in the record and can be argued on the merits.

> The evidence proffered by the conspiracy issue is not relevant and the reason it is not relevant is because if the evidence is sufficient to support dismissal, the fact that it was produced by the combined efforts of two or more people working together is irrelevant on the issue of dismissal. There is nothing illegal or improper in persons working together to prepare testimony providing they don't suborn perjury. There isn't any claim any of the testimony in this matter is perjured testimony, is improper in that regard.

> The allegations that people were coerced into testifying are likewise not relevant, even assuming that the allegations are true, short of giving assertions that the testimony coerced was in fact

false. In other words, the fact that people, assuming that proper testimony would support what it's offered for, the mere fact that somebody is coerced to testify — anytime you issue a subpoena a man is coerced to testify, if you wish to carry it that far.

The issue is whether the testimony is true or false, not that it was produced by a combination of things because somebody told him he had to testify or make a report.

Consequently, I don't regard any proffers in that respect to be relevant. This is quite aside from the fact that the so-called conspiracy issue was raised in the State hearing and while the appellant doesn't approve of the manner in which the questions were asked and answered, he was there; he had a right to produce his witnesses and had counsel; and didn't choose to do so, didn't choose to contest it, and it is not proper to try by the back door method to get in and simply retry all of the issues which have been tried already.

The argument that the testimony received below was insufficient in that it was either hearsay or too far removed is not relevant again on the issue of offering new evidence. Certainly on the merits it is, but not relevant on the issue of offering new evidence.

In *Lucke v. Commissioner,* 245 Md. 706, 228 A. 2d 313 (1967), *cert. denied sub nom. Lucke v. Davis,* 392 U. S. 926 (1968), the Court pointed out:

Proceedings under the Administrative Procedure Act ... do not include provision for a new trial. Instead, the reviewing court ... is given broad discretion to order the taking of new evidence in open court or before the agency, or where justice requires, to remand the case for further proceedings. Art. 41, sec. 255(e). [*Id.* at 709.]

It is obvious that Resetar did not show "to the satisfaction of the court that the additional evidence [was] material and that there were good reasons for failure to present it in the proceeding before the agency . . . ." We regard the standard of appellate review to be whether the trial judge abused his discretion. We recently discussed the matter of abuse of discretion at some length in *Mathias v. State,* 284 Md. 22, 394 A. 2d 292 (1978). In the words of Chief Judge Marbury for our predecessors in *Northwest'n Nat. Ins. Co. v. Rosoff,* 195 Md. 421, 436, 73 A. 2d 461 (1950), discretionary rulings "should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." We find no abuse of discretion on the part of the trial judge in this instance.

## III

We shall discuss together the issues as framed by Resetar as to whether he was guilty of misconduct in office and whether there was sufficient evidence to warrant his dismissal.

It must be borne in mind that under Code (1957, 1971 Repl. Vol.) Art. 41, § 255 the circuit court in reviewing the action of the State Board was limited to ascertaining whether it was in violation of constitutional provisions; in excess of its statutory authority or jurisdiction; made upon unlawful procedure; affected by other error of law; unsupported by competent, material, and substantial evidence in view of the entire record as submitted; against the weight of competent, material and substantial evidence in view of the entire record; unsupported by the entire record; or arbitrary or capricious. It follows that our review is likewise so limited. As Judge Singley put it for the Court in *Oxon Hill Rec. Club v. Water Res. Adm.,* 281 Md. 110, 375 A. 2d 567 (1977), citing a number of cases and other authority:

> [O]ur review of actions taken or determinations made by an administrative agency . . . is narrowly limited. Our inquiry is almost always limited to whether there was illegality, arbitrariness or

> unreasonableness in the action which was taken . . . .
> Even challenges directed at the substantiality of the
> evidence must be tested by standards of
> arbitrariness and capriciousness . . . . [*Id.* at 113.]

Chief Judge Murphy observed for the Court in *Zeitschel v. Board of Education,* 274 Md. 69, 82, 332 A. 2d 906 (1975), "[A] court should not substitute its judgment for the expertise of the administrative agency from which an appeal is taken, *Grosman v. Real Estate Comm'n,* 267 Md. 259, 297 A. 2d 257 (1972) . . . . [T]his is especially true in matters involving public education, *Bernstein v. Board of Education,* 245 Md. 464, 226 A. 2d 243 (1967)." Chief Judge Hammond pointed out for the Court in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A. 2d 282 (1967), citing cases and authority:

> [J]udicial review [of the action of an administrative
> agency] essentially should be limited to whether a
> reasoning mind reasonably could have reached the
> factual conclusion the agency reached. This need not
> and must not be either judicial fact-finding or a
> substitution of judicial judgment for agency
> judgment. [*Id.* at 309-10.]

Resetar says, "The State Board of Education of Maryland's Hearing Examiner, in an act of utter adjudicative indecency, abandoned his duty and responsibility to formulate, out of his own mind, his detailed findings of fact, conclusions of law, and recommendations of decision; and, instead, merely adopted the findings, conclusions and decision detailed and given by the County . . . Board's Hearing Examiner . . . who had heard the case earlier." We find no impropriety on the part of the State Board's hearing examiner in this instance. The testimony before the State Board was virtually identical with that before the County Board. The careful consideration given by the State Board's examiner to the evidence adduced is indicated by the portion of his conclusions and recommendations to the State Board which we have quoted.

It is suggested by Resetar that some of the testimony of certain witnesses produced by the County Board at the hearing before its hearing examiner so conflicts with the

testimony of those same witnesses before the State Board's hearing examiner as to cause it to lack probative force. Resetar failed in his brief in this Court to point out these conflicts. At oral argument we probed repeatedly for specification of the conflicts. No citation of conflicts has yet been given. Surely we are not obliged to search the testimony looking for conflicts. It is the duty of the challenger, Resetar in this instance, to point out any conflicts which would cause the testimony to lack probative force. However, we have meticulously examined the testimony of the witnesses mentioned at oral argument as having contradicted themselves. We found no such contradictions.

From reading the testimony of some of the witnesses on behalf of the County Superintendent and noting some of their evasions in response to questions on behalf of Resetar one might draw an inference of bias on the part of many of them toward Resetar. The matter of credibility, however, in each instance was for the hearing examiner who not only had the opportunity to hear the witnesses but also had the opportunity to observe their demeanor on the witness stand. Each of the examiners has been meticulously fair in his findings of fact. The findings of each of them are amply supported by the record. Moreover, it is significant here that Resetar does not deny the occurrence of the "jungle bunny" incident. He merely takes issue with the interpretation which should be put on it. He says he is not racially biased. The principal of his school said in his contacts with Resetar he found no reason to believe him to be guilty of racial prejudice. Resetar's attorney succeeded in eliciting from the member of the school staff who was in the immediate presence of the students to whom the "jungle bunny" remark was addressed an admission that it might have been given in a bantering manner, as has been pointed out in the quotation from the hearing examiner's report. The manner in which it was given, however, does not erase the fact that the statement was made. In this instance we have no difficulty in concluding that a reasoning mind reasonably could have reached the factual conclusion the agency reached in this case.

The State Board under Art. 77, § 6 is vested with authority

to "explain the true intent and meaning of the [school] law, and [to] decide all controversies and disputes that arise under it," with "their decision [being] final . . . ." Judge Henderson said for the Court in *Wilson v. Board of Education,* 234 Md. 561, 565, 200 A. 2d 67 (1964), that the totality of the various statutory provisions concerning the State Board "quite plainly . . . invests the State Board with the last word on any matter concerning educational policy or the administration of the system of public education." Judge Alvey said for our predecessors in *Wiley v. School Comm'rs,* 51 Md. 401, 406 (1879), that the State Board's authority constitutes "a visitatorial power of the most comprehensive character . . . ." Cases in which this rule has been recognized and followed include *School Comm. of Car. Co. v. Breeding,* 126 Md. 83, 89, 94 A. 328 (1915); *School Commissioners v. Morris,* 123 Md. 398, 402-03, 91 A. 718 (1914); *Underwood v. School Board,* 103 Md. 181, 188, 63 A. 221 (1906); and *Shober v. Cochrane,* 53 Md. 544, 549 (1880). However, its powers are not without limit. In *Wiley* the Court pointed out that the power might not "be corruptly and fraudulently used," a statement quoted in *Coddington v. Helbig,* 195 Md. 330, 337, 73 A. 2d 454 (1950). It follows, therefore, that its visitatorial power may not be exercised fraudulently, in bad faith, or in breach of trust. Also, the State Board does not have the power to decide purely legal issues. *School Comm'nrs. v. Henkel,* 117 Md. 97, 105, 83 A. 89 (1912), and *Duer v. Dashiell,* 91 Md. 660, 671, 47 A. 1040 (1900).

We have found no prior Maryland case which has addressed the question of whether certain conduct on the part of a teacher might or might not be misconduct in office. We find little help beyond the confines of the State. For instance, the annotations concerning teachers in 78 A.L.R.3d 19, 83, and 117 (1977), deal with sexual conduct, insubordination, and unauthorized absences, respectively. Causes for dismissal discussed in 68 Am. Jur.2d *Schools* §§ 162-66, 170-71, and 174-82 (1973), are such issues as incompetency, unprofessional conduct, insubordination, disloyalty, political activity, union membership or activity, and publicly criticizing school officials. The immorality issues are concerned with

intemperance, gambling, financial unresponsibility, dishonesty, fraud, and use of profane language. 78 C.J.S. *Schools and School Districts* § 202 (1952), states, "Good cause sufficient for removal of a teacher may consist of any cause that renders him unfit to be a teacher in the public school, so that the best interests of the school require that he should be removed or dismissed." The same section further states:

> Among the causes which, either under statute or contract or as a proper exercise of discretionary power by the school board, have been held sufficient to constitute grounds for dismissal of a teacher . . . are included insubordination or violation of the rules and regulations of the school board; lack of co-operation; inability or incompetency; lack of efficiency in teaching or discipline; negligence in discharge of, or inattention to, duty; willful and persistent negligence; membership in a subversive organization or engaging in subversive activities; refusal to waive immunity in appearing or testifying before a court or legislative committee; or improper conduct, or, according to other decisions on the question, immoral, or unprofessional conduct. [*Id.* at 1081-83 (footnotes omitted).]

As might be expected, courts have widely differed as to just what conduct on the part of a teacher will warrant dismissal. *See, e.g., Fisher v. Snyder,* 476 F. 2d 375 (8th Cir. 1973) (A 55-year old divorced woman because of the lack of suitable motel accommodations permitted male friends of her son to stay overnight in her small apartment. Dismissal was held arbitrary and capricious.); *Pettit v. State Board of Education,* 10 Cal. 3d, 29, 109 Cal. Rptr. 665, 513 P. 2d 889 (1973) (Elementary school teacher of a number of years' standing when 48 years of age applied with her husband for membership in a private club "evidently devoted primarily to promoting diverse sexual activities between members at club parties." An undercover police officer was present on one occasion. He observed a number of acts of sexual intercourse on the part of various members. In a one hour period he

observed this teacher "commit three separate acts of oral copulation with three different men at the party. When these acts took place, the participants were undressed, and there were other persons looking on." Expert testimony was presented that the teacher was "well-adjusted, and in view of the trauma and emotional turmoil caused by her suspension, was not likely to repeat the prior offenses." The court held, "[T]he board and the trial court were entitled to conclude, on the basis of ... expert testimony ... and the very nature of the misconduct involved, that [the teacher's] illicit and indiscreet actions disclosed her unfitness to teach in public elementary schools." Hence, an order revoking "her elementary school life diploma" was sustained.); *Morrison v. State Board of Education,* 1 Cal. 3d 214, 82 Cal. Rptr. 175, 461 P. 2d 375 (1969) (For a one week period "two men engaged in a limited, non-criminal physical relationship" of a homosexual nature but said to involve "[n]either sodomy ..., oral copulation ..., public solicitation of lewd acts ..., loitering near public toilets ..., nor exhibitionism ...." On the issue of whether his license to teach should be revoked it was held that it had not been shown that the teacher was unfit to teach.); *Kallas v. Board of Education,* 15 Ill. App.3d 450, 304 N.E.2d 527 (1973) (Record showed that teacher would not or could not maintain proper rapport with his administrators, students and parents and courses which he handled were suffering, not because of his educational limitations, which appeared to be adequate, but because of personal conduct involving lack of emotional self-control. Dismissal was upheld.); *Miller v. Board of Education of Dist. No. 132,* 51 Ill. App. 2d 20, 200 N.E.2d 838 (1964) (Teacher, said by the court to have had "a fiery temper," took a second-place trophy from the captain of his team at a high school basketball tournament, "broke it in pieces on the gymnasium floor, and used indecent language to the man who presented the trophy; and ... he further used profane language in the locker room in the presence of students." Also, he disciplined three individuals in violation of a regulation against corporal punishment. The court said these latter "incidents took place during the time when [he] was attempting to control a class of 45 boys, a number of

whom were considered to have serious behavior problems and who were referred to as 'teen-age rebels.' " The court "[took] judicial notice of the . . . atmosphere [then] existing in the schools of [its] County" and said, "In order for a teacher to function properly there must be some way of implementing the requirement that the students behave in an orderly and respectful manner." It "conclude[d] that the charges which were proved against the [teacher] were remediable and would therefore have required a warning notice."); *Gover v. Stovall,* 237 Ky. 172, 35 S.W.2d 24 (1931) (Teacher held guilty of "misconduct" justifying dismissal where he entered school building in evening with young ladies without turning on lights.); *Celestine v. Lafayette Parish School Board,* 284 So. 2d 650 (La. App. 1973) (Teacher, upon hearing two fifth grade female students use what was called "an extremely vulgar word meaning sexual intercourse," directed that the four letter word be written 1,000 times. Dismissal was held justified.); *McLaughlin v. Machias Sch. Com.,* 385 A. 2d 53 (Me. 1978) (Teacher "participated in a 'pick-up' basketball game . . . with a number of students." During the game while he was in the act of shooting for a basket a student pushed the teacher from behind. The teacher "immediately turned around and with a single blow of an open hand struck the student on his right cheek bone [,] . . . caus[ing] closure of the student's mouth," loss of one of his teeth and "serious damage to another tooth." The teacher "administered first aid to the student and drove him home." Dismissal was held justified.); *Fernald v. City of Ellsworth Superintend. Sch. Com.,* 342 A. 2d 704 (Me. 1975) (Teacher wrote a letter to her superintendent advising that she wished to take a one-week leave from school to accompany her husband on a trip sponsored by a fraternal organization. In her letter she said she had arranged for a substitute and thus was "sure [her] classes w[ould] be very capably covered." The superintendent wrote a letter back advising that her plans were "not approved." She went anyway. Dismissal was upheld.); *Wright v. Superintending Sch. Com., City of Portland,* 331 A. 2d 640 (Me. 1975) (Teacher, who also was a federally licensed gunsmith and holder of a concealed weapons permit "had a

revolver and ammunition in separate pockets of a ski jacket which he wore over his suit as protection against the extremely cold weather. It was not until he hung the jacket in a small alcove in the classroom in which he taught that he realized the presence of the gun and shells," which ultimately were stolen from the alcove. The court concurred in the conclusion that the teacher's "conduct in leaving the revolver in his jacket pocket without making arrangements for its security or apprising teachers using the classroom of its presence [showed] 'a grave lack of judgment on the part of [the teacher],'" but reversed an order for dismissal, "find[ing], as a matter of law, that a single, isolated instance of 'grave lack of judgment' which does not involve such moral impropriety, professional incompetency, or unsuitability to the discharge of his duties as to undermine 'the teacher's future classroom performance and overall impact on his students,' does not constitute 'unfitness to teach' within the intendment [of the applicable Maine statute]."); and *Beverlin v. Board of Ed. of Lewis County,* 216 S.E.2d 554 (W. Va. 1975) (There was a conflict between the starting date of school for teachers and an evening class at West Virginia University which the teacher proposed to attend. He sought unsuccessfully to make contact with his principal and assistant principal. He was suspended "for willful neglect of duty and insubordination." The court held that the teacher's "actions did not support a finding of insubordination and wilful neglect of duty" and that the decision of the superintendent and the board of education "were arbitrary and capricious on the basis of the record before [it].").

58 C.J.S. *Misconduct* (1948) says of the term used as a noun:

> The word is sufficiently comprehensive to include misfeasance as well as malfeasance, and as applied to professional people it includes unprofessional acts even though such acts are not inherently wrongful. Whether a particular course of conduct will be regarded as misconduct is to be determined from the nature of the conduct and not from its consequences. [*Id.* at 818.]

Black's Law Dictionary (4th ed. 1968) says of "misconduct":

> A transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior; its synonyms are misdemeanor, misdeed, misbehavior, delinquency, impropriety, mismanagement, offense, but not negligence or carelessness. Mandella v. Mariano, 61 R. I. 163, 200 A. 478, 479. [*Id.* at 1150.]

The same authority refers at 1150 to "misconduct in office" as being "[a]ny unlawful behavior by a public officer in relation to the duties of his office, willful in character." In the context of the unemployment compensation statute in *Emp. Security Board v. LeCates,* 218 Md. 202, 208, 145 A. 2d 840 (1958), this Court quoted with approval from 81 C.J.S. *Social Security and Public Welfare* § 162 (1953), relative to "deliberate" and "wilful" misconduct as " '[d]eliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee . . . .' "

*Wright v. Superintending Sch. Com., City of Portland, supra,* has relevance here since the court in reaching its conclusion there insisted that to be grounds for dismissal the act must bear upon a teacher's fitness to teach, as did the California court in *Morrison v. State Board of Education, supra.* Bearing in mind the grant of power by the General Assembly to the State Board to "explain the true intent and meaning of the [school] law," we are of the view that the State Board could well have concluded that the remark of the teacher here might undermine his future classroom performance and overall impact on his students, to paraphrase the language used in *Wright.* Accordingly, we find no error of law on the part of the State Board in its conclusion that the "jungle bunny" episode constituted misconduct in office.

In meting out punishment in a criminal case judges constantly take into consideration the record of the accused. A first-time offender often will receive treatment different from that of a hardened criminal for the same act. Were we

in this case to hold either that the acts of Resetar did not amount to misconduct in office or that the State Board was arbitrary and capricious in upholding Resetar's dismissal because it took into consideration the prior record of Resetar, we might well find ourselves accused, as was the majority in *Norton v. Macy*, 417 F. 2d 1161, 1168 (D.C. Cir. 1969), of "violat[ing] the judicial cloister erected by the Administrative Procedure Act and rush[ing] out, robes flying, into the forbidden area of administrative discretion to give kind assistance to the subject of what [we might believe] to be [improper] tactics at the hands of the [administrative agency]."

We have found that there was a sufficient predicate for the State Board's findings of fact and that it properly found Resetar's conduct to amount to misconduct in office within the meaning of the statute. We have further found that the State Board was not guilty of arbitrary, capricious or illegal conduct when it took the prior reprimands to Resetar into consideration in meting out punishment—any more than it would have been arbitrary if because of a teacher's prior unblemished record it concluded that such conduct warranted a punishment less than the ultimate sanction of dismissal. That leaves us with the question, however, of whether dismissal in this instance was action so harsh as to amount to arbitrary and capricious action on the part of the State Board. It is impossible to catalogue just what would or would not constitute arbitrary action on the part of an administrative agency such as the State Board in imposing sanctions, since each situation must be judged on its own facts. Certainly the agency is obliged to take the factual setting and circumstances of the misconduct into consideration, as was done here. If, for example, the teacher here had merely uttered the racial epithet relative to the students under his breath so that it was heard only by a colleague of the teacher's race standing next to him, a reviewing court might determine dismissal to be so harsh a sanction as to be arbitrary conduct, while no question of arbitrariness would arise if dismissal were ordered because

a teacher directed such an epithet at a student then in the process of reciting in the teacher's class.

We can conceive of situations in which dismissal for a single act of misconduct by a teacher possessed of an otherwise clean record might be held upon judicial review to be arbitrary and capricious. Since there had been prior admonitions by the County Board to Resetar, we point out that in this case we are not obliged to decide what the result might have been had Resetar's prior record been without blemish.

In reviewing the action of an administrative agency, so long as we do not find it to have been arbitrary or capricious in the sanction imposed, we are not permitted to specify a sanction which we might have considered more appropriate. As held by this Court in *Insurance Comm'r v. Nat'l Bureau, supra,* in reviewing the action of an administrative agency we must not engage in judicial fact-finding or substitute our judgment for that of the agency. In this instance we find no arbitrary conduct on the part of the administrative agency, the State Board. Accordingly, we find no grounds for reversal.

*Judgment affirmed; appellant to pay the costs.*

*Orth, J., concurring in part and dissenting in part:*

No one denied that John Resetar, Jr. was "a competent junior high school science teacher." He taught in the Montgomery County school system for a decade, from March 1965 until he was fired in April 1975 by the Montgomery County School Board (the County Board). His dismissal was for misconduct in office upon the recommendation of the Superintendent of Schools for Montgomery County (the Superintendent). I do not agree that the evidence, in view of the entire record, was legally sufficient to warrant the sanction imposed.

Resetar had been placed on leave with pay by the Superintendent, effective at the close of business on 9 August 1974. He was informed that a review of his employment was to be made upon completion of an administrative investigation "concerning the alleged charge that [he] made a remark to

a group of students at Gaithersburg Junior High School which might be interpreted as being intemperate under the circumstances and might be interpreted as having a racial connotation." The investigation was conducted, and by letter dated 16 September 1974 Resetar was notified that the Superintendent would recommend his "dismissal from service in the Montgomery County Public Schools to the Board of Education under the provisions of Article 77, Section 114, of the Public School Laws of Maryland upon the grounds of misconduct in office and insubordination." [1] The effective date of the dismissal was to be October 11, 1974, and he was to remain on leave with salary through that date. The letter stated that the County Board would act upon the recommendation at its meeting on 8 October unless Resetar requested a hearing before the Board.

Resetar requested a hearing, and the County Board referred the matter to a hearing examiner. Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) art. 77, § 114A. The examiner conducted a plenary hearing and recommended that the Superintendent's recommendation be adopted. The County Board heard argument and issued a decision and order on 14 April 1975 dismissing Resetar as of 10 April 1975.[2] Resetar appealed to the State Board of Education (the State Board). There was a *de novo* hearing before the hearing examiner for the State Board, who recommended that Resetar be dismissed. The State Board followed that recommendation. Resetar appealed to the Circuit Court for Montgomery County. It affirmed the judgment of the State Board. Resetar appealed to the Court of Special Appeals. We issued a writ of certiorari before decision by that court.

---

1. Resetar had long since completed his probationary period and could be dismissed only for cause as provided by the statute referred to by the Superintendent. Maryland Code (1957, 1969 Repl. Vol.) art. 77, § 114 provided that "[a]ny county board of education may, on the recommendation of the county superintendent of schools ... dismiss any teacher ... for immorality, misconduct in office, insubordination, incompetency, or wilful neglect of duty, provided that the charge or charges be stated, in writing, to such person and that such person be given an opportunity to be heard by said board of education upon not less than 10 days notice...."

2. The County Board found that "insofar as the Board's schedule did not permit it to hear this argument within 30 days as set forth in its rules, the Board directs the superintendent to restore John Resetar, Jr. to pay for the period of March 27 to April 10, 1975."

The County Board hearing examiner submitted a lengthy report which prevailed through all that followed. It served as the basis for Resetar's dismissal by the County Board and for the various determinations regarding the propriety of the dismissal in the subsequent appeal proceedings. The County Board adopted "the findings, conclusions and recommendations of [its] hearing examiner." The State Board hearing examiner, "after having carefully considered all of the evidence at the hearing *de novo,* including the transcript of the hearing below, . . . reached the same findings, conclusions and recommendations as did [the County Board examiner]," and adopted them as his own.[3] He incorporated the County Board examiner's "entire report by reference" in his report to the State Board. The State Board's opinion stated simply: "We hereby adopt the Findings, Conclusions and Recommendations of the Hearing Examiner in this case." The Circuit Court for Montgomery County affirmed "the decision of the State Board . . . which adopted the County Board's decision to terminate [Resetar's] services in the Montgomery County School system for misconduct in office . . ." because "[t]he record below fully supports the findings adopted by the State Board . . . as well as those of the County Board." [4] Thus, the circuit court accepted the findings, conclusions and recommendations of the State Board, which adopted the findings, conclusions and recommendations of its examiner, who adopted the findings, conclusions and recommendations of the County Board, which adopted the findings, conclusions and recommendations of its examiner. So, it is the findings and conclusions of the County Board hearing examiner, considered in light of the evidence adduced at both hearings, which must be evaluated in determining whether the Circuit Court for Montgomery County properly affirmed the

---

3. The record of the County Board hearing consisted of some 298 pages of testimony and 18 exhibits. The matter was heard *de novo* upon appeal to the State Board. The transcript of the proceedings before the County Board examiner and exhibits there admitted were received in evidence by agreement of the parties. In addition, witnesses appeared before the State Board examiner. The transcript of their testimony consisted of 219 pages. Five more exhibits were admitted.

4. The Circuit Court for Montgomery County denied a motion by Resetar to take additional testimony and heard the case on the record made below.

judgment of the State Board dismissing Resetar from the Montgomery County school system.

The Superintendent's letter of 16 September 1974 to Resetar served as the required written statement of charges. The letter focused on a remark Resetar was alleged to have made to a group of students at Gaithersburg Junior High School. The Superintendent did not set out exactly what Resetar said, merely characterizing the remark, as he did in his letter of 9 August 1974 placing Resetar on leave, as one "which might be interpreted as being intemperate under the circumstances and might be interpreted as having a racial connotation." He deemed the remark to be "educationally unsound and unprofessional," and not acceptable "by this school system as proper behavior by an employee." He asserted that by making the remark, Resetar had violated the Policy Statement on Human Relations adopted by the Montgomery County Board of Education, which stated in part that ". . . a fundamental goal of the Montgomery County Public Schools is to establish and maintain an atmosphere in which students and staff can develop attitudes for effective, cooperative living, including" respect for the individual, cultural differences, economic, political and social rights of others, and the right of others to seek and maintain their own identities. The letter noted that Resetar had been "warned both formally and informally" while a staff member at the school and several other junior high schools "about making remarks to students and/or fellow staff members which were not only intemperate and overreactive, but which also, in some instances, had derogatory, racial or ethnic connotations." The recommendation of dismissal, according to the Superintendent, was the result of an investigation conducted regarding the alleged remark, a conference with Resetar, and "the cumulative effect of your behavior in your previous assignments despite earlier warnings that this type of language and behavior was inappropriate and could not be condoned. . . ." The County Board examiner thought that "[t]he letter charges Mr. Resetar with misconduct in office consisting of intemperate behavior and making remarks with derogatory racial connotations," and that "[t]he letter also

charges insubordination consisting of violation of the Board of Education Policy Statement on Human Relations and of failing to conform his behavior to warnings previously issued."

The County Board examiner found that the allegation of insubordination had not been sustained.[5] There remained the charge of misconduct in office which was bottomed upon "intemperate behavior and making remarks with derogatory racial connotations."

The remark made by Resetar which was the crux of the letter of 16 September 1974 and which, in fact, led to the charges set forth in the letter, occurred on 18 June 1974 while he was a seventh grade science teacher at Gaithersburg Junior High School. It was: "Look at those jungle bunnies. Somebody ought to feed them bananas." The circumstances under which this remark was made were fully set out by the examiner as quoted in the majority opinion. The examiner noted that it was this remark that triggered the action against Resetar, but he concluded that the charge of misconduct in office was based not only on this remark but also on four more incidents on other occasions. He set them out in his findings 12, 13, 15 and 16 and designated them respectively as "lunchroom profanity," "the liar accusation," "the remark to the unwashed girl," and "the public reprimand." They are described in the report as follows:

12. On November 13, 1972, while a teacher at

---

5. The examiner explained:

Insubordination is basically a different kind of offense from misconduct. It involves a conscious, willful, and recalcitrant rejection of the authority of a supervisory official. Regulations and policies adopted by the Board of Education establish norms for the conduct of people subject to its jurisdiction. The flouting of such norms constitutes misconduct. I do not believe that violation of such norms also constitutes insubordination. If it did, the logical conclusion would be that virtually every case of misconduct would also be insubordination.

The documents relied upon by the superintendent as directives violated by Mr. Resetar ... are critical of Mr. Resetar's handling of particular situations, but are only general admonitions to moderate his conduct in the future. Stated in terms of the legal framework of this case, it is fair to characterize these documents as urging Mr. Resetar to refrain from misconduct in the future. They are not sufficiently pointed to constitute direct orders flouted by Mr. Resetar in the June 18th incident. ...

Broome Junior High School, Mr. Resetar had lunch with four male teaching colleagues in the faculty lunch room. While complaining about a matter of minor annoyance to him involving use of the copying machine, he expressed his irritation by making derogatory remarks about the librarian and the three Educational Materials Center aides accompanied by profanity and gratuitous sexual references. One of the EMC aides was in an adjoining room and overheard the statements, which she described as "loud, vile, abusive." Mr. Resetar thought the setting was private, and did not intend to offend the ladies in question.

13. On November 15, 1972, Mr. Resetar and the Broome guidance counselor, Mr. Neher, both came on the scene of an altercation among students. When Mr. Resetar said he had not seen the incident develop, the counselor made a sarcastic remark, and Mr. Resetar called the counselor a "God damned liar." [6]

15. In February, 1973, while a teacher at Newport Mill Junior High School, during a class period, Mr. Resetar was disturbed by a noise outside his classroom door. He opened his door and admonished a student, but cannot remember just what he said. The principal, Mr. Redmond, understood from his investigation that the admonition was in the form of a sarcastic remark. An accompanying black student, Valerie Smith, responded with a sarcastic remark. Mr. Resetar's reply evidently suggested improved cleanliness for Valerie. The testimony diverges on this, as the principal, the assistant principal, and the human relations specialist, from their investigation,

---

6. The "lunchroom profanity incident," finding 12, and the "liar accusation," finding 13, were investigated by an associate superintendent and an area superintendent. "Upon their recommendation ... the superintendent notified Mr. Resetar that his 'language use was inappropriate and cannot be condoned.' The superintendent also advised Mr. Resetar that a transfer to a different school would be arranged for him, in the hope that 'a fresh start in a different setting' would be helpful."

understood the remark to be in the nature of telling Valerie that she was dirty, stank, and needed a bath. However, Mr. Resetar denied making that statement. The matter ended with the student apologizing for interfering with a matter that was not her concern and with Mr. Resetar apologizing also. He explained his thinking, "for the good of all that an apology at this particular point would terminate this confrontation." The assistant principal sent Mr. Resetar a memorandum regarding this case, urging that a teacher should not be provoked by a student's comments, but should respond "as a mature adult" and in "a more considerate way."

16. On May 17, 1973, while a teacher at Newport Mill Junior High School, Mr. Resetar brought two disruptive students, Greg Gassaway and Alfredo (Oscar) Gonzalez, to the school office for disciplinary consideration. Mr. Maley, the assistant principal, testified that Mr. Resetar spoke in a "loud, domineering, demanding voice" in requesting Mr. Maley to take some action in relation to the rude and disruptive behavior of the boys. Mr. Maley, the same day delivered a memorandum to Mr. Resetar expressing concern over this incident and over "the manner in which you frequently reprimand students in a loud and condemning voice in the presence of the main office staff." In addition to the office staff, a visitor to the school was present. The memorandum requested Mr. Resetar in the future, "when you have serious concerns about one of your students, . . . bring him in a quiet manner directly to my office so that we can discuss the matter in private." [7]

Thus, there were five incidents which might substantiate the charge of misconduct in office. The examiner concluded that

---

7. The examiner also noted other episodes which were related at the hearing "as background information purporting to indicate a pattern of attitudes and conduct on Mr. Resetar's part." He recounted the details of some of these and referred generally to others as to which he believed that findings were not warranted. In any event, none of these incidents, in his view, were included in the charges.

two of them did not support the charge. It was his opinion that the "lunchroom profanity" (finding 12) and the "public reprimand" (finding 16) did not amount to misconduct. He found, however, that misconduct in office was established by the "jungle bunny" event, the "liar accusation" incident (finding 13) and the "unwashed girl" episode (finding 15). They mounted up to misconduct in office because they involved intemperate conduct.[8]

The examiner was satisfied, from general experience and from evidence adduced, that the term "jungle bunny" is "a derogatory racial epithet," and that "[c]oupled with the reference to eating bananas, the remark appears to be clearly insulting from a racial point of view." He asserted that "[a]ny overt expression of racial or ethnic bias in the presence of students would be misconduct, in violation of the Board's Human Relations Policy." He found that, although in the "jungle bunny" event there was misbehavior on the part of a group of students directed toward Resetar, it was "intemperance, rising to the level of misconduct, for Mr. Resetar to respond with a racial epithet."

The examiner classified the "liar accusation" incident as "intemperate and overreactive to the counselor's sarcastic remark," which "unfortunately turned a minor annoyance into a serious conflict." "But," the examiner pointed out, "the fault was not entirely Mr. Resetar's." The examiner decided that "the liar accusation barely goes across the misconduct threshold."

The examiner believed that in the circumstances surrounding the "unwashed girl" episode Resetar was

---

8. The examiner observed:

> For analytical purposes, intemperate conduct can be viewed in three degrees. In the first place, everybody is intemperate and overreactive at times, so a minimal amount of this kind of behavior must be tolerated before the threshold of misconduct is reached. Second, intemperance which goes beyond what is ordinary and trivial constitutes misconduct, particularly if it involves students. A teacher occupies a special relationship with his students, assuming significant responsibility for their welfare and guidance while under his supervision. So self control is particularly important for a teacher. Third, if the intemperate behavior is flagrant or repeated, then the misconduct is serious enough to warrant dismissal.

intemperate in telling the student, in effect, that she was dirty. The examiner noted: "There may be occasions when a teacher would consider it to be beneficial to suggest to a child improved habits of personal care, but this does not appear to have been such a case. Mr. Resetar initially spoke sarcastically to a noisy student, and then responded to the impertinence of the accompanying student with a personal affront." He concluded that "this was misconduct, but not aggravated."

So it was that the examiner "concluded that three instances of intemperate conduct amounting to misconduct [were] shown," one of which (the "jungle bunny" event) also constituted "misconduct in violation of the Human Relations Policy." But he expressly declared his belief that "no one of these cases, standing by itself, is sufficiently extreme to warrant dismissal of the teacher." He, therefore, found it necessary "to consider whether such a pattern of inappropriate behavior exists as to aggravate the particular offenses to the point where the sanction of dismissal is warranted."

As indicated, *supra,* the examiner determined that the charge of misconduct consisted of "intemperate behavior and making remarks with derogatory racial connotations." He found, with respect to racial bias, that no pattern of inappropriate conduct existed as to aggravate the three offenses to the point where the sanction of dismissal was warranted. There was evidence presented at the hearing concerning Resetar's racial attitudes. This evidence, according to the examiner, showed him to be strict but not racially prejudiced. The examiner placed no credence in the complaints of some students that Resetar was prejudiced as they "could easily have been convenient excuses for students whose own behavior was subject to question." There was substantial evidence, including testimony from black teachers and supervisors, that they did not consider Resetar to be racially biased, that he treated all students fairly, that he was a strict disciplinarian toward both blacks and whites, that he was no more harsh in his discipline with blacks than with whites, and that although his grading was less generous than

that of his immediate predecessors, it was without bias between black and white students.

The examiner found, however, a pattern of persistent behavior with respect to intemperate outbursts, culminating in the "jungle bunny" case. "For this reason, [he] recommend[ed] that the superintendent's recommendation be adopted and that Mr. Resetar be dismissed for misconduct in office."

At the time the Circuit Court for Montgomery County rendered its decision in this case, a court, in reviewing administrative proceedings, as the majority point out, might have reversed the decision of the agency "if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions" were, among other things, "[u]nsupported by competent, material and substantial evidence in view of the entire record as submitted," or "[a]gainst the weight of competent, material, and substantial evidence in view of the entire record as submitted," or "[u]nsupported by the entire record, as submitted by the agency and including de novo evidence taken in open court." Md. Code (1957, 1978 Repl. Vol.) art. 41, § 255 (g) (5) (6) (7).[9] Of course, it is not permissible for the appellate court to substitute its judgment for that of an agency if its determination finds any support in the facts, *Oxon Hill Rec. Club v. Water Res. Adm.*, 281 Md. 110, 114, 375 A. 2d 567 (1977), and this is especially true in matters involving public education, *Zeitschel v. Board of Education*, 274 Md. 69, 82, 332 A. 2d 906 (1975). On the other hand, if the court shall find that substantial rights of a petitioner for review have been prejudiced, by one or more of the statutory causes, because of an administrative finding, inference, conclusion or decision, then it is the function of the court to reverse or modify the order. *Bernstein v. Real Estate Comm.*, 221 Md. 221, 230, 156 A. 2d 657 (1959). *See* Maryland Rule B12.

---

9. *See* Acts 1978, ch. 884, effective 1 July 1978.

I think that the conclusion of the examiner that the acts of Resetar showed a persistent pattern of intemperate conduct was unsupported by substantial evidence in view of the entire record when considered within the ambit of the three incidents which the examiner determined comprised the charge of misconduct. On the contrary, I believe that the conclusion was against the weight of the competent, material and substantial evidence in view of the entire record. The examiner expressly declared his belief that "no one of [the three] cases, standing by itself, is sufficiently extreme to warrant dismissal of the teacher." He frankly stated that "[t]he case is a close one, since only the jungle bunny episode is particularly serious." The examiner recounted Resetar's testimony to the effect that when he made the remark he was speaking only to himself, that the remark was a " 'mumble,' reflecting his disgust and frustration with the attitude of these students throughout the year," and that he believed that it was "humanly impossible" for the students outside the window to hear him. The assistant principal of Gaithersburg, who was present and heard the remark, said that Resetar was not shouting, and that his tone of voice did not indicate that he was particularly angry or upset, but rather could be characterized as "bantering." And it should be emphasized that the examiner expressly found no racial bias or prejudice on the part of Resetar. Of the other two incidents included in the charge to show misconduct, the "unwashed girl" matter was deemed to be "not aggravated," and the "liar accusation" affair, he thought, "barely goes across the misconduct threshold." The examiner recommended dismissal, not because of the only "particularly serious" incident, namely the "jungle bunny" remark, which he declared was not in itself sufficiently extreme to warrant dismissal, but because there existed a persistent pattern of intemperate conduct by reason of which the particular offenses were aggravated to the point where the sanction of dismissal was warranted. In my opinion, the three incidents found to be misconduct in office fall far short of "substantial evidence" sufficient to show a persistent pattern of intemperate conduct. That the "liar accusation" and

"unwashed girl" incidents are relatively innocuous is borne out by an evaluation report concerning Resetar made while he taught at Newport Junior High. It was signed by two evaluators on 18 June 1973 and thus was after these two incidents relied on to show a persistent pattern of intemperate conduct. The report called for an evaluation of Resetar as "satisfactory" or "unsatisfactory" with respect to scholarship, teaching power, executive ability, professional responsibility and personality. He was rated "satisfactory" as to each. He was recommended for continued employment. The report included comments under the various evaluation categories and in regard to "personality," the comment on "Strengths" was:

> He has a strong personality. He expects all students to achieve their maximum potential and to accept responsibility for their own personal behavior in class.

The report indicated that the evaluators knew of the incidents. Under the heading "Plans for Continued Improvement," they said:

> He needs to show more patience for the reluctant learner. Students of all races and ethnic origins deserve equal respect and consideration from him. In dealing with disruptive students it's essential that he maintain his professional composure.

This did not deter the evaluators from recommending him for continued employment. And as we have indicated, the County Board examiner declared: "No one denies that he is a competent junior high teacher." I would reverse the judgment of the Circuit Court for Montgomery County and hold that the evidence in view of the entire record was not legally sufficient to warrant Resetar's dismissal.

I agree with the majority that the failure of the County Board to render a decision in thirty days of the receipt of its hearing examiner's findings was not reversible error in the circumstances. I concur with that part of the majority's

opinion which holds that the circuit court did not abuse its discretion in denying Resetar's motion to present additional evidence in the appeal proceeding before it.

Chief Judge Murphy authorized me to say that he joins in this opinion.