Nancy L. WELCH et al.

v.

**BOARD OF EDUCATION OF BALTI-
MORE COUNTY, etc., et al.**

Civ. No. K–79–1102.

United States District Court,
D. Maryland.

July 22, 1979.

Alan Edgar Harris, Baltimore, Md., for plaintiffs.

Leonard S. Jacobson, County Sol. for Baltimore County, Towson, Md., Joseph Kiel, Asst. County Sol., Baltimore, Md., and Arnold Jablon, Asst. County Sol., Towson, Md., for defendants Board of Education of Baltimore County, et al.

Stephen H. Sachs, Atty. Gen., and Ellen M. Heller, Asst. Atty. Gen., Baltimore, Md., for State defendants.

FRANK A. KAUFMAN, District Judge:

Plaintiffs, residents of eight Baltimore County school districts,[1] seek in this class action, instituted under 42 U.S.C. §§ 1983 and 1985, punitive and declaratory relief to prevent defendants, Board of Education of Baltimore County, Maryland ("County Board"), State of Maryland Superintendent of Schools David W. Hornbeck, and State of Maryland Board of Education Hearing Examiner Mitchell J. Cooper, from closing or converting to other-than-present educational uses the eight schools.[2] A temporary restraining order, issued by this Court on June 14, 1979, expired on June 22, 1979. During a hearing on the record that latter day, plaintiffs' quest for further preliminary relief was denied. Defendants have moved for summary judgment. That motion presents five issues of law: (1) whether this Court should abstain from determining plaintiffs' constitutional claims; (2) whether Md.Educ.Code Ann. §§ 3–108 and 3–109 violate the Equal Protection Clause of the Fourteenth Amendment; (3) whether the actions taken by defendants relating to school closings and conversions violate plaintiffs' substantive or procedural due process rights; (4) whether Md.Educ.Code Ann. § 4–119(a) is void for vagueness; and (5) whether in some way, only vaguely asserted by plaintiffs, the actions sought to be restrained violate any statute or regulation under Maryland law. Because this Court is of the opinion that plaintiffs' constitutional claims are devoid of merit, this Court need not reach the abstention issues, which are

---

1. Gray Manor, Merritt Point, Inverness, Parkville, Towson, Ruxton and Eastwood Elementary Schools and Towsontown Junior High School. A Federal Civil Rule 23(b)(2) class, composed of residents of those school districts, has been certified by this Court as requested by plaintiffs.

2. Plaintiffs also seek damages. This Court separated the damage issues from liability and equitable relief issues during a hearing on June 22, 1979. The disposition of liability issues herein renders it unnecessary for any questions pertaining to types of equitable relief and/or damages to be further considered.

tangled and difficult.[3] Nor, since plaintiffs' constitutional claims are deemed meritless, will this Court exercise pendent jurisdiction over or reach on the merits any possible state claims which plaintiffs may be raising. *Sigmon v. Poe*, 564 F.2d 1093, 1096 (4th Cir. 1977) (per curiam).

In the summary judgment context of this case, all facts alleged by plaintiffs are taken as true.[4] On that basis, the relevant and material facts are as follows:

1. In 1976, the Superintendent of the County Board expressed the opinion that that Board should close Towson Elementary School.

2. In December, 1976, citizens in the Towson area formed a "Task Force" to support keeping the school open.

3. In the Spring of 1977, a staff committee was appointed by the County Superin-

tendent to study the problem of declining school enrollments.

4. On May 26, 1977, the County Board adopted that staff committee's report which recommended study of the closing, consolidation and conversion of schools in designated cluster areas by a planning staff which would present its findings to a community task force in each cluster area and subsequently report to the County Superintendent.

5. On or about September 15, 1977, the County Board asked community groups to form cluster area task forces to study which school in each area should be closed. Those task forces later recommended closing Parkville, Ruxton, Hampton and Dundalk Elementary Schools.

6. On January 26, 1978, the County Superintendent and his staff recommended that the County Board close the oldest

---

**3.** Several members of the plaintiff class presented certain due process claims in the Circuit Court for Baltimore County on January 11, 1979. At that time, that Court denied an *ex parte* injunction. Several members of plaintiff class also sought and were granted an administrative hearing before a hearing examiner of the State Board of Education. *Simpson v. Board of Education of Baltimore County*, HE 4–79–MC (June 5, 1979). Questions of *Younger*-type abstention therefore arise. *Moore v. Sims*, —— U.S. ——, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *American Civil Liberties Union v. Bozardt*, 539 F.2d 340 (4th Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

*Burford*-type abstention questions also arise. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *See* 1A Part 2 Moore's Federal Practice ¶ 0.203[2]–[4]. *See also Wincamp Partnership v. Anne Arundel County*, 458 F.Supp. 1009 (D.Md.1978). It may also be that denial by the Circuit Court for Baltimore County of the *ex parte* injunction calls for application of the doctrines of *res judicata* and/or collateral estoppel. *Wiggins v. Murphy*, 576 F.2d 572 (4th Cir. 1978), *cert. denied*, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 57 (1979); *Rimmer v. Fayetteville Police Department*, 567 F.2d 273, 93 S.Ct. 1827, 36

L.Ed.2d 439 (4th Cir. 1977); *see also Preiser v. Rodriquez*, 411 U.S. 475 (1973); *cf. American Civil Liberties Union v. Bozardt*, 539 F.2d 340 (4th Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); *see generally* 1B Moore's Federal Practice ¶¶ 0.406[1]–0.416[5].

Under the circumstances, prudence dictates no further consideration of such abstention and *res judicata* issues. In *Leis v. Flynt*, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (per curiam majority opinion), the United States Supreme Court simultaneously accepted certiorari and reversed the decision of the United States Court of Appeals for the Sixth Circuit. The Supreme Court decided the constitutional merits of the case without reaching the abstention issue, stating 439 U.S. at 438 n.1, 99 S.Ct. at 699, n.1, 58 L.Ed.2d at 720 n.1: "Petitioners also contend that the injunction [against an ongoing state obscenity prosecution] violates principles of abstention embodied in our decisions in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 . . . (1971) [further citations omitted]. Because of our disposition of the merits of this case, we think it unnecessary to consider that issue."

**4.** Certain of the recitals set forth below are stated by plaintiffs in only the most conclusory way. Some of them, which are particularly so set forth, are specified *infra* as being allegations. That in no way means that any of the other recitals are accepted as factually correct, other than in the present summary judgment posture of this case. In that posture, all of plaintiffs' allegations are taken as true and correct.

school in certain older areas, namely, Parkville, Towson, Gray Manor and Dundalk Elementary Schools, and convert Ruxton and Eastwood Elementary Schools to special education facilities by June 30, 1978, and that Lutherville and Inverness Elementary Schools be closed by June 30, 1979.

7. On February 13, 1978, the County Superintendent and his staff presented certain information to the County Board. No prior notice of that presentation was given. (Plaintiffs' allegation.)

8. On February 25, 1978, 16 of the 22 delegates representing Baltimore County in the Maryland House of Delegates introduced House Bill 1811. That bill provided a one-year moratorium on any school closure in Baltimore County.

9. On March 9, 1978, the County Superintendent and his staff recommended a one-year delay in the school closing process.

10. The County Board refused the input of the then County Executive and the help of the Director of the Office of Planning and Zoning of Baltimore County when deciding which schools to close. (Plaintiffs' allegation.)

11. In June, 1978, the President of the County Board appointed a Board Committee to study school closings.

12. Every two weeks during the months of June through October, 1978, that Board Committee held meetings in violation of state "Sunshine Laws." (Plaintiffs' allegation.)

13. On November 7, 1978, members of the Maryland House of Delegates and a new Baltimore County Executive were elected.

14. Sometime after November 7, 1978, the County Superintendent submitted to the County Board additional proposals concerning certain cluster areas.

15. On January 8, 1979, one of the herein named plaintiffs, Anderson, attended a meeting in the office of the Baltimore County Executive. Those present included the Chief Executive, two of his assistants, the then Director of Baltimore County Planning and Zoning, the County School Superintendent and the Assistant School Superintendent for Capital Planning.

16. On January 8, 1979, the then Director of Baltimore County Planning and Zoning was invited to speak before the County Board of Education.

17. On January 11, 1979, two of the named plaintiffs in this case, Anderson and Silver, filed suit in the Circuit Court for Baltimore County (Case No. 98629, Equity) against the County Board and the State Superintendent of Schools, asking that Court (1) to declare that the County must have the permission of the State Superintendent of Schools prior to closing any school, (2) to declare that citizens had been denied due process because they had not been allowed verbally to comment and give their opinions or factual data to the County Board at its work sessions, and (3) to restrain further proceedings concerning school closings or conversions until all interested citizens could be afforded the opportunity verbally to present information and/or opinions.

18. On January 11, 1979, Judge Paul E. Alpert, sitting in the Circuit Court for Baltimore County, (1) issued an order declaring that the County Board must seek and obtain the approval of the State Superintendent of Schools prior to closing any school, and (2) denied plaintiffs' quest for injunctive relief. Order, *Anderson, et al. v. Board of Education of Baltimore County, et al.*, Case No. 98629, Equity.

19. On January 11, 1979, Judge Alpert stated in chambers that citizens have a right to speak to the County Board, and issued an "informal advisory opinion." (Alleged by plaintiffs in Count 2 of the complaint. Seemingly, no record of that conference is in evidence.)

20. On January 11, 1979, during one of the regular meetings of the County Board, citizens expressed verbally their views on the school closings and conversions. There was no notice to any citizen in advance that he would be given the opportunity to speak at that meeting. (Plaintiffs' allegation.)

21. At the January 11, 1979 meeting, the County Superintendent and his staff recommended that the County Board close Lutherville, Towson, Parkville, Dundalk, Gray Manor and Inverness Elementary Schools. The recommendation was also made that the County Board convert Ruxton and Eastwood Elementary Schools and Towsontown Junior High School to special education facilities. The County Board accepted the recommendations except that it determined that Dundalk Elementary School should remain open and Merritt Point Elementary School should be closed. Appropriate parliamentary procedures and requests were ignored, and citizens in the Merritt Point area were not afforded advance notice that their school might be affected as a result of that meeting. (Plaintiffs' allegations.)

22. On January 15, 1979, the County Superintendent wrote to the State Superintendent of Education requesting the latter's approval of the County Board's decision to close or convert the eight schools.

23. On January 26, 1979, the County Board and the State Superintendent filed demurrers to the state court complaint of Anderson and Silver.

24. On February 16, 1979, 939 citizens of Baltimore County appealed to the State Board the County Board's decision to close the eight schools.

25. On February 16, 1979, the State Superintendent wrote to the County Superintendent to inform him that he would review the decision of the County Board. The State Superintendent also wrote to certain named and unnamed interested citizens to inform them that they would have the opportunity to submit written information to him up to March 1, 1979, and set forth the standard of review he would use in examining the County Board's proposals. The State Superintendent refused to speak personally with any citizens. (Plaintiffs' allegation.)

26. On February 27, 1979, the County Superintendent wrote to the State Superintendent to explain the County Board's decision and the procedures followed in reaching that decision.

27. On March 1, 1979, plaintiff Anderson filed a petition in the Circuit Court for Baltimore County, Case No. 98629, referred to *supra*, requesting temporary and permanent injunctive relief to restrain the State Superintendent of Education from acting on the County Superintendent's submission until the State Board of Education could hold a hearing and decide certain issues.

28. On March 1, 1979, Judge Alpert extended the time period in which the State Superintendent would receive written material from citizens from March 1, 1979 to March 15, 1979, but denied any quest for injunctive relief.

29. On April 2, 1979, the State Superintendent approved the process utilized by and the decisions reached by the County Board, approved the closings recommended by the County Superintendent, but refrained from comment on the recommended conversions.

30. Beginning May 20, 1979, defendants in this case began preparing the schools for closing.

31. On May 24, 1979, the hearing examiner for the State Board held a pre-hearing conference. Seemingly, counsel for plaintiffs herein was present.

32. The State Board hearing examiner held a hearing on June 5, 1979 near the commencement of which he denied the request of plaintiffs' counsel in this case to stay the hearing, which had been noticed in advance, until plaintiffs could institute and obtain a final decision in this case in this Court. The hearing examiner refused so to do, and plaintiffs' counsel shortly thereafter left the hearing, stating that he had a prior scheduled obligation in a state court. *Simpson v. Board of Education of Baltimore County*, HE 4–79–MC (June 5, 1979), Tr. at 18. After he left, the examiner continued to take evidence, and, at the conclusion of the hearing, stated that he would prepare findings and conclusions in the case after the hearing transcript became available. *Id.* at 39.

33. An appeal is currently pending before the State Board of Education from all of the recommendations of the Baltimore County Board of Education.

34. The hearing examiner has denied that he has any jurisdiction to find the statutes complained of to be unconstitutional and has refused to stay the school closings. (Plaintiffs' allegations.)

*Equal Protection*

■ Plaintiffs assert that Md.Educ.Code Ann. §§ 3–108 and 3–109 ("sections 3–108 and 3–109") violate their Fourteenth Amendment rights to the equal protection of the laws, because they provide for an appointed school board in Baltimore County, whereas section 3–113 provides for elected school boards in eight of Maryland's 23 counties.[5] The classification attacked herein is not itself suspect; neither does it interfere with the exercise of a fundamental right. *See Sailors v. Board of Education,* 387 U.S. 105, 108, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967); *see also Cohen v. New York,* 52 Misc.2d 324, 275 N.Y.S.2d 719 (Sup.Ct.N.Y. 1966). Accordingly, the "strict scrutiny" test is not applicable, and there is no need for the state to advance a compelling interest in order to justify the statute. Rather, the test is one of rational relationship between the classification and a legislative goal to be served thereby. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

■ In *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), Maryland's Sunday Closing Laws were held constitutional. One of the grounds of attack on those laws was that they permitted retailers in Anne Arundel County to sell certain goods on Sundays but forbade retailers in other of Maryland's counties from doing likewise. *Id.* at 427, 81 S.Ct. 1101. Mr. Chief Justice Warren, in rejecting that challenge, wrote (at 427, 81 S.Ct. at 1106): "[W]e have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that

territorial uniformity is not a constitutional prerequisite." *See Norwalk CORE v. Norwalk Board of Education,* 298 F.Supp. 213, 223 (D.Conn.1969), *cert. denied,* 423 F.2d 121 (2d Cir. 1970). In *Sailors v. Board of Education, supra,* Mr. Justice Douglas, writing for the majority of the Court, held that there was no right to elect an administrative body such as a school board and characterized (387 U.S. at 110 n.7, 87 S.Ct. at 1553) several school board functions as administrative, including "[o]ne of the board's most sensitive functions, and the one giving rise to this litigation, . . . the power to transfer areas from one school district to another." The action challenged herein is thus one which may be performed by a "subordinate governmental instrumentalit[y]." *Id.* at 107–08, 87 S.Ct. 1549. There is no fundamental right of citizens to elect the administrators who perform such duties. This is made clear in *Sailors* (at 108, 87 S.Ct. at 1552) where Mr. Justice Douglas wrote:

> We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election. * * *

■ Nor may the argument be made that a stiffer test than the rational basis test should be applied because the challenged statute relates to education.

> Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation.

*San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297–1298, 36 L.Ed.2d 16 (1973). Furthermore, the Maryland statutory scheme attacked by plaintiffs deprives no child of

---

**5.** Plaintiffs do not argue that the Baltimore County School Board was not appointed pursuant to statute or that the school board was not properly constituted under that statute.

access to education. *See id.* at 19, 37, 93 S.Ct. 1278.

It is thus. the rational basis test which applies in the within case. In *McGowan v. Maryland, supra,* 366 U.S. at 425–26, 81 S.Ct. at 1105, the Court wrote:

[T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts may reasonably be conceived to justify it. [Citations omitted.]

*See also Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 491, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Dandridge v. Williams,* 397 U.S. 471, 483–85, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

The need for freedom of state legislatures to experiment with different techniques and schemes is one of the rational bases for differences in the effect brought about by state laws of the kind involved herein. Thus, in *Sailors* (387 U.S. at 110–11, 87 S.Ct. at 1553) Mr. Justice Douglas commented:

Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects nonlegislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here. * * *

■ In *Sailors,* the need to experiment seemingly was the only basis relied upon to satisfy the test of rational nexus. That, in and of itself, compels rejection of plaintiffs' principal equal protection thrust.

■ Plaintiffs also may be making the additional equal protection argument that defendants arbitrarily discriminated against older schools because defendants did not sufficiently consider closing certain new schools. However, both plaintiffs' complaint and other parts of the record in this case indicate that the County School Board's actions were based upon detailed studies and analyses prior to decisions being made as to school closings and/or conversions. Since the record in this case does not suggest that any impermissible reasons were relied upon by the Board, its decision to close or convert older schools rather than newer ones would hardly appear to be unreasonable.[6]

*Substantive Due Process*

■ Plaintiffs claim that the decline in real property values which, according to plaintiffs, will result from the closing and/or converting of the schools, constitutes a "taking" contrary to due process unless adequate compensation is made. But such closings and/or conversions do not constitute a taking. In *Ancarrow v. City of Richmond,* 600 F.2d 443 (4th Cir. 1979), plaintiffs, proceeding, *inter alia,* under 42 U.S.C. § 1983 and the Fourteenth Amendment, alleged that the City of Richmond had "taken" their property, a marina, by polluting the James River because the pollution lowered or destroyed the value of the property as a marina. The District Court's determination that plaintiffs therein had stated a valid claim under the Fourteenth Amendment was reversed by the Fourth Circuit. In so doing, Judge Hall, writing for a unanimous Court, held (at 447–448) that diminution in real property values resulting from lawful state use of neighboring property does not constitute a taking for purposes of a constitutional claim. In *Ancarrow,* the Fourth Circuit concluded that Virginia had the power to deal with sewage (at 446). Herein, Maryland and

---

**6.** "Older schools" do not of course constitute a suspect classification. Nor do plaintiffs have a fundamental right to have "older schools" remain open.

Baltimore County have the power to build, operate, close and convert schools. Md. Educ.Code Ann. Titles 1–4. In sum, if defendants' actions cause any decline in value of plaintiffs' real property, defendants' actions will nevertheless not constitute a taking under the Constitution.

That result comports with *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which involved a New York City urban landmark law directly restricting the uses to which plaintiffs could put the airspace above Grand Central Terminal. Plaintiffs contended that the same constituted a taking without due process of law. The Supreme Court affirmed the Court of Appeals of New York decision that no taking had occurred. Mr. Justice Brennan wrote (438 U.S. at 131, 98 S.Ct. at 2663, 57 L.Ed.2d at 652–53):

> [A]ppellants, focusing on the character and impact of the New York City law, argue that it effects a "taking" because its operation has significantly diminished the value of the Terminal site. Appellants concede that the decisions sustaining other land use regulations, which, like the New York law, are reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution in property value, standing alone, can establish a taking * * *.

Like *Penn Central,* this case is analogous to zoning cases. In *Penn Central* (438 U.S. at 125, 98 S.Ct. at 2660, 57 L.Ed.2d at 649), Mr. Justice Brennan, citing many older Supreme Court decisions, noted that the Supreme Court "has upheld land use regulations that destroyed or adversely affected recognized real property interests." Here, where government has not directly acted to affect plaintiffs' property, the argument against the existence of a taking is all the stronger. The power to operate schools unquestionably relates to the public welfare.

*San Antonio Independent School District v. Rodriguez, supra* 411 U.S. at 30, 93 S.Ct. 1278. That the application of state laws may cause fluctuations in real property values in a school district does not establish a taking. See *Penn Central Transportation Co. v. City of New York, supra* 438 U.S. at 125, 98 S.Ct. at 2660, 57 L.Ed.2d at 649.[7]

*Procedural Due Process*

Plaintiffs seemingly claim under Md. Educ.Code Ann. § 2–205(g)(3) that before any school is closed or converted, they have a constitutional procedural due process right to have the members of the State and County Boards of Education hear in person from all "interested citizens" who wish to speak before or with them. The resolution of plaintiffs' said contention initially depends upon whether a resident of a school district possesses a liberty or a property interest in a school in his district remaining "as is." *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Obviously, plaintiffs possess no such liberty interest. Nor do they have such a property interest unless it is granted to them under state law. *Bishop v. Wood,* 426 U.S. 341, 344–45, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (per Stevens, J.). *Bishop* dealt with the claim of a policeman that the City Manager of Marion, North Carolina had terminated his employment as a policeman without a hearing to determine sufficiency of cause. *Id.* at 342, 96 S.Ct. 2074. The Supreme Court found that, under applicable North Carolina law, the plaintiff was an "at will" employee who could be terminated without a hearing because he had no property interest in his job protected by the Fourteenth Amendment. *Id.* at 345–47, 96 S.Ct. 2074. The job of the plaintiff in *Bishop* had been created by local government, there was no property interest given by that government, and therefore the job could be terminated in accordance

---

**7.** The Supreme Court noted in *Penn Central* that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by Government [citation omitted], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good," *id.* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. It should be noted that maintaining and staffing unnecessary schools may itself prove to be expensive.

with the procedures designated for such terminations. Here, the schools were placed in their locations by the local and state governments. As in *Bishop*, then, state law will determine whether there is a property interest in the schools remaining "as is."

In *Bernstein v. Board of Education of Prince George's County*, 245 Md. 464, 226 A.2d 243 (1966), plaintiffs attacked a proposed transfer of children from one elementary school to another. Plaintiffs argued, *inter alia*, that the Board failed to give notice of a hearing regarding the proposed mid-term transfer, that the law required both that a hearing be held and that the Board "consult and advise with interested citizens" prior to the transfer, and that the hearing held by the Board violated due process of law (at 469, 226 A.2d at 247). In rejecting those challenges, Judge Oppenheimer stated for the Court that "there is no right or privilege to attend a particular school" (at 472, 226 A.2d at 248).[8]

No decision of any Maryland court supports plaintiffs' assertion of a property interest granted by state law. Nor does Md. Educ.Code Ann. § 4–114 ("section 4–114"), entitled "Acquisition and disposition of real property; construction, etc., of school buildings," aid plaintiffs. That statute provides, in part:

> (c) *Disposition of Real Property.*—(1) If, with the approval of the State Superintendent, a county board finds that any land, school site, or building no longer is needed for school purposes, it shall be transferred by the county board to the county commissioners or county council

and may be used, sold, leased, or otherwise disposed of, except by gift, by the county commissioners or county council.

On its face, that law is clear: county school boards have the discretion to decide when a school is no longer needed, subject to the approval of the State Superintendent. Further, no specific procedures are required by the statute, other than the obligation to seek approval from the State Superintendent.[9] Under Md.Educ.Code Ann. § 4–205(c)(4), plaintiffs have their right to appeal to the State board, a right plaintiffs have seemingly either exercised or been granted. In sum, as far as the record discloses, plaintiffs have not been denied any procedural right provided to them by Maryland law.

■ Other Maryland statutory provisions require examination in the context of plaintiffs' property right contention. Md. Educ.Code Ann. § 4–115 ("section 4–115") is entitled "Selection of school sites; public hearing." Its hearing provisions, set forth in subsection (c) thereof, are not applicable to the disposition of already existing schools which, as shown above, is covered by section 4–114. Md.Educ.Code Ann. § 2–205(g)(3) ("section 2–205(g)(3)") provides:

> Through the State Superintendent, the Board shall consult with and advise county boards, county superintendents and their staffs, principals, teachers, and interested citizens.

The language of that statute does not, as plaintiffs contend, require the State Superintendent to consult with all interested citizens; nor does it convey a right to anyone

---

8. A challenge to a school closing similar to the one brought here was raised in *Brown v. Board of Education of Montgomery County*, Civil No. H–73–884 (1974). Judge Harvey granted summary judgment for the defendants. The appeal was subsequently voluntarily dismissed. (Copies of the said complaint and of Judge Harvey's Order have been placed in the court file in this case).

*See Wallis v. Blue*, 263 F.Supp. 965 (N.D.Ga. 1967) (three-judge court), in which the Court held that there is no property right to have children attend a particular school and stated (at 970): "The location of public schools is a matter in which no citizen has a personal right

anymore than he would in the location of a highway, a hospital, a park, or other public facility."

Nor does the owner of property as a taxpayer own in common or otherwise any part of a physical school plant located in the district in which his property lies. *See Kerpelman v. Board of Education*, 261 Md. 436, 276 A.2d 56, *cert. denied*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 100 (1971).

9. Such approval has been sought. Letter of January 15, 1979 from the County Board of Baltimore County to the State Superintendent.

to have any given quantum of consultation.[10] The statute does not say that the State Board *must* consult with all interested citizens. Further, the presence of the word "shall" in the statute does not necessarily impose any mandatory duty upon the State Board to consult in person with anyone at all. *See Resetar v. State Board of Education of Maryland*, 284 Md. 537, 399 A.2d 225 (1979), in which the Court of Appeals of Maryland wrote (at 547, 399 A.2d at 230): "The question of whether a statutory provision using the word 'shall' is mandatory or directory 'turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished.' [citation cited]." Relevant factors in determining whether or not the word "shall" is mandatory in a given context include

> * * * whole surroundings, the. purposes of the enactment, the ends to be accomplished, the consequences that may result from one meaning rather than from another, and the cardinal rule that seemingly incongruous provisions shall be made to harmonize rather than conflict * * *.

*Upshur v. Baltimore City*, 94 Md. 743, 757, 51 A. 953, 958 (1902), *quoted in Resetar v. State Board of Education of Maryland, supra* 284 Md. at 547–48, 399 A.2d 225.

If the word "shall" as used in section 2–205(g)(3) requires that one or more members of the State Board consult with *all* interested citizens about a particular matter, such a requirement might well paralyze the State Board and block an unpopular local decision by filibuster. Further, if plaintiffs' argument is correct, the State Board must consult not only *all* interested citizens but also all county boards, all county superintendents, all members of their staffs, all principals, and all teachers. Such consultation is obviously impractical.

It is also to be noted that section 2–205(g)(3) appears in a section of the Maryland laws which deal with general educa-

tion policy. A local school closing, however important locally, will generally not involve overall policy. That this is the case is substantiated by the fact that the state legislature entrusted local school closings largely to county school boards.

Additionally, section 2–205(g)(3) must be read together with sections 2–205(g)(2) and (4). Section 2–205(g)(2) states that "the State Board shall exercise general control and supervision over the public schools and educational interests of this State." Section 2–205(g)(4) provides that the "Board shall seek in every way to direct and develop public sentiment in support of public education." The word "shall" appears in each of those three subsections. It is reasonable to assume that that word has the same meaning in all three. It is also to be noted that section 2–205(b)(2) calls for the State Board to "cause to be carried out those provisions of this article that are within its jurisdiction." Such jurisdiction is supervisory as well as original. Its exercise does not require the State Board to repeat and duplicate everything that a county school board does. The structure of the education system of Maryland gives certain responsibilities primarily, or at least in the first instance, to county school boards. Plaintiffs ignore that fact. Plaintiffs' interpretation of "shall" would also render section 2–205(g)(4) impractical since no one can claim to know, learn or listen to every possible way of "direct[ing] and develop[ing] public sentiment in support of public education"; nor could the state sensibly afford to pay for effecting every such means.

 If the word "shall" as used in those three subsections of section 2–205(g) is considered as discretionary, leaving the extent of Board action under that section up to the Board, then the use of that word makes practical sense. Herein, the issue of how much Board action is required by sections 2–205(g)(2) and (4) need not be reached. In this case, this Court concludes that defend-

---

**10.** Plaintiffs also suggest that any interested citizen has a First Amendment right to speak in person to school officials. The answer is that the right to petition government does not extend so far.

ants have complied with section 2–205(g)(3) with regard to the school closings and conversions herein attacked and therefore have not violated any of plaintiffs' procedural due process rights, if any there are, created by that statute.

Under *Perry v. Sindermann, supra* 408 U.S. at 601–02, 92 S.Ct. 2694, property rights may perhaps be brought into being if an unwritten procedure exists which is superimposed upon a statutory requirement, provided any such procedure or "understanding" does not run counter to the statute's plain meaning. *See Leis v. Flynt*, 438 U.S. 438, 442–443, 99 S.Ct. 698, 701, 58 L.Ed.2d 717, 721–22 (1979) (per curiam). In this instance, there not only is no evidence of any such procedure or understanding, but also the language of section 4–114(c) is unambiguous. That language places each citizen on notice that a county school board, with the approval of the State Superintendent, has the authority to close or convert schools subject to the right of appeal to the State Board pursuant to section 4–205(c)(4).

*Void for Vagueness*

■ Plaintiffs allege that Md.Educ.Code Ann. § 4–119(a) ("section 4–119(a)") is void for vagueness. Section 4–119(a) reads as follows:

> *Consolidation of schools.*—If a county board considers it practicable, it shall consolidate schools.

Plaintiffs argue that section 4–119(a) subjects "Plaintiffs and those similarly situated to the whim and caprice of an administrative body, thus denying them due process of law." (Complaint, p. 20 at (b).)

In *Patterson v. Ramsey*, 413 F.Supp. 523, 530 (D.Md.1976), *aff'd*, 552 F.2d 117 (4th Cir. 1977), Judge Young wrote:

> State law . . . provides for close supervision of the county boards with regard to construction of school buildings (Art. 77 § 47), consolidation of schools (Art. 77 § 53) and curriculum and courses of study (Art. 77 § 55).

Section 4–119 is simply a renumbering of Article 77 § 53. Judge Young's construction of that statute certainly argues against any reading of it as facially void for vagueness.

Void for vagueness is a doctrine applied in several contexts, most often in First Amendment and prior restraint contexts. *See, e. g., Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). When so applied, the void for vagueness doctrine is used to test a statute which is challenged as restrictive of First Amendment freedoms. The statute in question here is not subject to such a challenge.

The doctrine is also used to test criminal statutes which are challenged as giving a potential defendant no warning that his conduct was prohibited. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). The statute involved herein is not a criminal one.

In *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Supreme Court noted:

> It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.

*Id.* at 550, 95 S.Ct. at 714. That approach was followed in *Berry v. City of Portsmouth, Virginia*, 562 F.2d 307 (4th Cir. 1977). At issue in that case was a city retirement plan which gave the Board of Trustees of the retirement fund the power to reduce certain disability benefits if the employee resumed work or refused "suitable" employment. The challenge was that the statute prescribed "no standards to guide the Board in determining . . . whether or not certain employment is 'suitable to an employee's capacity' under the ordinance." *Id.* at 312. The Fourth Circuit rejected the vagueness challenge as premature.

> [Plaintiffs] can point to no plaintiff whose benefits were reduced when he chose not to accept "suitable" employment. Nor do they contend that the Board has not or will not comply with acceptable standards despite the ordinance's silence. * * *

*Id.* at 312. The second sentence of the above quotation is especially relevant to

this case. The decision by the County Board was carefully discussed and researched prior to its inception. The administrative body did not act on the basis of whims. Its decisions were neither arbitrary nor capricious. Thus, the statute was not vague as applied in this case. Accordingly, plaintiffs herein have no basis in any event for a void for vagueness attack on the statute.[11] Indeed, all in all, plaintiffs' void for vagueness argument has no merit.

\* \* \* \* \* \*

For the reasons set forth in this opinion, defendants' summary judgment motions will be granted.

---

11. *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 58–60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *United States v. National Dairy Products Corp.,* 372 U.S. 29, 31–32, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). In the latter, Mr. Justice Clark wrote in the majority opinion (at 36, 83 S.Ct. at 599–600):

[W]e also note that the approach to "vagueness" governing a case like this is different from that followed in cases arising under the First Amendment. There we are concerned with the vagueness of the statute "on its face" because such vagueness may in itself deter constitutionally protected and socially desirable conduct. \* \* \*